UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CV-552-F

| | |
|---|---|
| ISCO INDUSTRIES, LLC, a Kentucky limited liability company, )<br>)<br>) | |
| Plaintiff, )<br>) | **ORDER** |
| v. )<br>) | |
| CARL D. ERDLE, an adult individual, )<br>) | |
| Defendant. ) | |

This matter came before the undersigned for a hearing on the Motion for Preliminary Injunction [DE-16] filed by Plaintiff ISCO Industries, LLC ("ISCO") against Defendant Carl D. Erdle ("Erdle"). The hearing concluded with the undersigned denying ISCO's request for a preliminary injunction. This order memorializes and clarifies the ruling.

## I. PROCEDURAL HISTORY

This action arises out of a complaint filed on October 11, 2011, by ISCO claiming that Erdle breached the terms and conditions as set forth in the Non-Disclosure and Non-Competition, Non-Solicitation Agreements ("Non-Compete Agreement") consummated on August 25, 2003. Summons was issued as to Erdle on October 13, 2011, and on October 25, 2011, ISCO submitted Proof of Service indicating that Erdle had been properly served with process. *See* [DE-15].

On October 18, 2011, ISCO filed its first Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction [DE-9]. The court, on October 24, 2011, issued an Order [DE-14] denying ISCO's request for temporary injunctive relief for failure to abide by the requirements under Rule 65(b) of the Federal Rules of Civil Procedure, namely, that the moving

counsel certifies in writing any efforts made to give notice and the reasons why it should not be required.

On October 25, 2011, ISCO filed its second Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction [DE-16], this time attaching the affidavit of Andrew L. Fitzgerald, co-counsel for ISCO. The affidavit provides that Erdle was served with a copy of the Complaint and Summons on October 19, 2011. *See* [DE-16], Ex. 12. The affidavit further certifies that a copy of the Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction was sent to Erdle via Priority Mail on the same date and that it had not been returned to ISCO as undeliverable. *See* [DE-16], Ex. 12. Upon careful consideration, the court allowed in part ISCO's second Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction and scheduled a preliminary injunction hearing on Friday, November 4, 2011.

A day before this hearing, on November 3, 2011, Erdle filed his Motion to Dismiss [DE-24] and Motion for Expedited Discovery [DE-26]. At the November 4, 2011, preliminary injunction hearing, due to the late filing of these motions, and to afford both parties an opportunity to reach a settlement, the court continued this hearing to December 19, 2011. With the consent of both parties, the temporary restraining order already issued was extended to this date. On December 19, 2011, the court heard both parties' arguments as to the whether the issuance of a preliminary injunction is appropriate in this matter. Upon careful consideration of the testimonies and evidence presented, the court denied ISCO's request for a preliminary injunction.

## II. FACTUAL BACKGROUND

ISCO is a customized piping solutions provider based in Louisville, Kentucy that stocks and sells a variety of piping materials from more than 25 facilities spanning the United States, Canada,

and Australia. [DE-1], Compl. ¶ 5. Because the piping distribution business is highly competitive, ISCO claims that it makes significant investments of time and money into training its salespersons to become knowledgeable about its business, products, capabilities, and sales strategies to enable them to effectively and efficiently market and sells its products and services. [DE-1], Compl. ¶ 8. ISCO further states that it requires all of its employees to sign Non-Disclosure Agreements prohibiting the dissemination of detailed confidential information relating to ISCO's rental rates, fabrication capabilities, supply chain management, pricing information, customer lists, and general business strategy. [DE-1], Compl. ¶¶ 10, 12. ISCO contends that Erdle signed a Non-Disclosure Agreement when he began working for ISCO as a salesperson on August 25, 2003. [DE-1], Compl. ¶¶ 15, 16.

The controversy in this case centers around the optional Non-Compete Agreement allegedly entered into by Erdle on August 25, 2003. [DE-1], Compl. ¶ 19. The Non-Compete Agreement contains several restrictions in the event that Erdle separated from his employment with ISCO. [DE-1], Compl. ¶ 20. In particular, Sections 3 and 4 of the Non-Compete Agreement prohibit Erdle from divulging any non-public information, knowledge or data relating to ISCO's business that Erdle obtained while he was employed by ISCO, in addition to any of ISCO's financial information. [DE-1], Compl. ¶ 20. Section 5 of the Non-Compete Agreement requires Erdle to return all memoranda, notes, records, code books, papers, and other documents and all copies thereof relating to ISCO's business or the business of its subsidiaries or affiliates upon the termination of Erdle's employment with ISCO. [DE-1], Compl. ¶ 21.

Furthermore, Section 6 of the Non-Compete Agreement contains non-solicitation restrictive covenants that provide, *inter alia*, that:

3

> For a period of thirty-six (36) full consecutive months after separation from employment, Employee shall not...divert, contact, solicit, do business with, or attempt to do any of the foregoing with any existing or prospective customer of the Company or with any person who has been a customer of the Company at any time within two years before Employee's Separation from employment... [or] direct or otherwise target any selling, marketing or promotional efforts of any person at any existing or prospective customer of the Company.

[DE-1], Compl. ¶ 22. The Non-Compete Agreement also includes non-competition restrictions, which provide, *inter alia*, that:

> For a period of thirty-six (36) full consecutive months after separation from employment, Employee shall not...engage in any business, acquire any interest in any business or profession, or serve as an agent, lender, member, officer, partner, director, employee, investor, proprietor, consultant, stockholder, representative, or independent contractor of any business, that competes with the business of [ISCO] or any affiliate (and their respective assignees and successors in interest) within thirty (30) miles of any location where [ISCO] does business and the Employee provided services for [ISCO].

[DE-1], Compl. ¶ 23. ISCO contends that these restrictive covenants were "in consideration for, and a necessary condition of employment." [DE-1], Compl. ¶ 24. Furthermore, ISCO states that these restrictive covenants were "reasonably necessary to protect legitimate business interests of ISCO, including trade secrets, other valuable confidential or business information, substantial relationships with existing or prospective vendors, suppliers, customers, contractors, consultants, and independent contractors with whom ISCO has or seeks a business relationship[.]" [DE-1], Compl. ¶ 24.

ISCO claims that after Erdle signed the Non-Compete Agreement, it invested "significant amounts of time, effort [,] and money training Erdle to become an effective salesman for ISCO's products and services." [DE-1], Compl. ¶ 27. During his employment, ISCO further contends that Erdle worked as a salesman out of his home office in Wake Forest, North Carolina, and was the Regional Sales Manger for the North Carolina and South Carolina territories. [DE-1], Compl. ¶ 28.

4

Through the training and confidential resources provided, Erdle is alleged to have generated significant revenue for ISCO. [DE-1], Compl. ¶ 30. ISCO claims that Erdle was compensated by a commission plan which ISCO modified periodically. [DE-1], Compl. ¶ 29. In addition, ISCO claims that from the 4th Quarter of 2003 through the 2nd Quarter of 2011, Erdle received and retained $30,025.05 of additional bonuses as a byproduct of his agreement to be bound by the Non-Compete Agreement. [DE-1], Compl. ¶ 31.

On September 27, 2011, Erdle resigned from his position at ISCO to work for HD Supply, Inc. ("HD Supply"), who is one of ISCO's primary competitors. [DE-1], Compl. ¶¶ 32-34. In this position, ISCO contends that Erdle will be able to contact ISCO's customers in these territories to whom he sold while at ISCO, solicit their business, and capitalize on the goodwill which ISCO had earned with these customers. [DE-1], Compl. ¶ 37. More specifically, ISCO claims that Erdle will be able to use his knowledge of ISCO's rental rates, fabrication capabilities, supply chain management, pricing information, and other general business strategies to give HD Supply unfair competitive advantages against ISCO, which will lead to lost sales and loss of business opportunities. [DE-1], Compl. ¶ 38.

### III. DISCUSSION

A preliminary injunction is an extraordinary interlocutory remedy, the purpose of which is to protect the status quo and prevent irreparable harm during the pendency of a lawsuit. *In re Microsoft Corp Antitrust Litig.*, 333 F.3d 517, 524-25 (4th Cir. 2003). A court, in its discretion, may issue a preliminary injunction only if the moving party clearly establishes the following factors: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor, and (4) an injunction is in the public

interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *West Virginia Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

ISCO contends that preliminary injunctive relief is appropriate in light of the equitable considerations and because Erdle agreed to a Non-Compete Agreement that was both validly executed and reasonable in scope and duration. On the other hand, Erdle essentially argues a preliminary injunction should not be issued because ISCO cannot show a likelihood of success on the merits. In support of this argument, Erdle claims that the Non-Compete Agreement was neither signed nor executed. Furthermore, Erdle contends that, even if the Non-Compete Agreement was deemed validly executed, it would be unenforceable as it is unreasonable. The court will address these arguments in turn.

### A. Validity of Self-Scripted Social Security Number as a Signature

Erdle first argues that he neither signed nor executed the Non-Compete Agreement. In making this argument, Erdle highlights the fact that the Non-Compete Agreement lacks his signature and instead only contains his self-scripted social security number. Erdle claims that he did not want to be bound by the restrictions in the Non-Compete Agreement and therefore he never signed the agreement. *See* [DE-24], Ex. 1, ¶ 5-6. He contrasts this agreement with the Non-Disclosure Agreement, which he admittedly signed and agreed to be bound by its restrictions. *See* [DE-24], Ex. 1, ¶ 7. In support of his position, Erdle claims that North Carolina law should apply and cites to *New Hanover Rent-A-Car, Inc. v. Martinez*, in which the court held that a preliminary injunction was improper as Plaintiff was unable to show a likelihood of success on the merits because the non-compete agreement lacked a "cursive script or any writing at all on the signature line of the agreement[.]" 136 N.C. App. 642, 647, 525 S.E.2d 487, 491 (2000). Moreover, Erdle argues that

even if Kentucky law would apply, the Non-Compete Agreement would still be unenforceable as "when the law requires any writing to be signed by a party thereto, it shall not be signed unless the signature is subscribed at the end or close of the writing." *See* [DE-28], Erdle's Resp. in Opp., p. 8 (citing Ky. Rev. Stat. § 446.060).

At the outset, the court notes that the statute of frauds, whether in Kentucky or North Carolina, requires that agreements lasting more than one year need to be in writing and signed by the party against whom the contract would be enforced. *See* N.C. Gen. Stat. § 75-4 (2010); *see* Ky. Rev. Stat. § 371.010 (2010). Here, because the Non-Compete Agreement lacks a signature, the determinative inquiry is whether Erdle's self-scripted social security number at the end of this agreement is sufficient to constitute a "signature" as required under both the North Carolina and Kentucky statute of frauds. Upon careful consideration, the court finds that Erdle's self-scripted social security number does indeed satisfy the statute of frauds under either North Carolina or Kentucky law.

First and foremost, it appears clear to the court that the last page of the Non-Compete Agreement does not include a separate line in which the party agreeing to be bound by the contract is to script his or her signature. Instead, the contract includes a line labeled "Employee, Social Security #." *See* [DE-5], Ex. 2, p. 5. Erdle does not dispute that he personally scripted his social security number on the last page of the Non-Compete Agreement[1] nor was any evidence presented to the contrary. Secondly, it appears that the first page of the Non-Compete Agreement includes

---

[1] At the December 19, 2011, hearing, the court noted that an individual's social security number is confidential information that is not readily given to another party. Therefore, the fact that Erdle scripted his social security number on the last page of the Non-Compete Agreement provides, at the very least, some indication that Erdle agreed to be bound by terms of the agreement.

7

Erdle's scripted signature where it asks for the name of the employee. *See* [DE-5], Ex. 2, p. 1. At the December 19, 2011 hearing, ISCO also provided a copy of an email exchange between Erdle and Mark Tufts of HD Supply in which Erdle acknowledged that he signed the Non-Compete Agreement. In the email addressed to Mark Tufts, Erdle stated "I have attached a copy of a non compete a former ISCO employee sent to me, *we both signed this agreement on the same day, this is identical to the agreement I signed.*" ISCO, Ex. 13 (emphasis added). Finally, ISCO provided, as evidence, various copies of commission reports in which Erdle received additional bonuses as a result of agreeing to the Non-Compete Agreement. Erdle does not dispute that he received these additional bonuses nor was any attempt made to return these bonuses. In light of the evidence presented and upon careful review of the Non-Compete Agreement, it appears that Erdle's self-scripted social security number at the end of the agreement manifests sufficient intent to be bound by terms of the Non-Compete Agreement. Accordingly, the court is unpersuaded by Erdle's contention that ISCO is unlikely to succeed on the merits of the case because the Non-Compete Agreement lacks a signature.

**B. Reasonableness of Non-Compete Agreement in Scope and Duration**

Erdle also argues that ISCO is unlikely to succeed on the merits of the case because the Non-Compete Agreement, even if deemed validly executed and signed, is unreasonable in its scope and duration. In making this argument, Erdle claims that North Carolina law should apply to the interpretation of this agreement as an application of Kentucky law would be a violation of North Carolina public policy. ISCO counters by claiming that the Non-Compete Agreement is both reasonable in geography and in time and that the application of Kentucky law, as specified in the choice of law provision in the agreement, would not be violative of North Carolina public policy.

The court commences its examination of the reasonableness of the Non-Compete Agreement by reviewing the applicable standards as set forth under both Kentucky and North Carolina law. In Kentucky, covenants not to compete are generally valid and enforceable. *Kegel v. Tillotson*, 297 S.W.3d 908, 911 (Ky. Ct. App. 2009) (citing *Ceresia v. Mitchell*, 242 S.W.2d 359, 364 (Ky. 1951)). The courts in Kentucky will uphold restrictive covenants not to compete where they are reasonable in scope and in purpose. *Hall v. Willard & Woolsey, P.S.C.*, 471 S.W.2d 316, 317-18 (Ky. Ct. App. 1971). "Reasonableness is to be determined generally by the nature of the business or profession and employment, and the scope of the restrictions with respect to their character, duration and territorial extent." *Id.* "[A]n agreement in restraint of trade is reasonable if, on consideration and circumstances of the particular case, the restriction is such only as to afford fair protection to the interests of the covenantee and is not so large as to interfere with the public interests or impose undue hardship on the party restricted." *Borg-Warner Protective Services Corp. v. Guardsmark, Inc.*, 946 F. Supp. 495, 501 (E.D. Ky. 1996).

In North Carolina, the courts have held that the primary purpose of a covenant not to compete is to protect the relationship between an employer and its customers. *See A.E.P. Industries, Inc. v. McClure*, 308 N.C. 393, 408, 302 S.E.2d 754, 763 (1983). To be enforceable in North Carolina, a covenant not to compete must be: "(1) in writing; (2) reasonable as to time and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) designed to protect a legitimate business interest of the employer." *Hartman v. W.H. Odell & Assoc.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994). When examining the reasonableness of the restraint, the court must weigh the time limitation and the geographical scope in tandem as the two requirements are not independent and unrelated. *Farr Assoc., Inc. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878,

9

881 (2000). "The reasonableness of a noncompetition covenant is a matter of law for the court to decide." *Beasley v. Banks*, 90 N.C. App. 458, 460, 368 S.E.2d 885, 886 (1988).

Here, irrespective of whether an application of North Carolina or Kentucky law would be most appropriate in this case, it appears that Non-Compete Agreement would be deemed unreasonable due to its overbreadth under either jurisdiction. During the December 19, 2011, hearing, ISCO called to the stand Tom O'Neill ("O'Neill"), who is the Chief Sales Officer for the company. During his testimony, O'Neill explained that ISCO was in the business of selling a very specialized, "niche" product, namely HDPE piping, that most other companies have no familiarity with. Furthermore, the prospective customers also have very little knowledge as to ISCO's piping products. Therefore, ISCO had to train its sales representatives about its specialized product to garner trust in its products and, ultimately, future business from prospective buyers. O'Neill further explained that the ISCO had offices in various places in North America and internationally, but that Erdle was the Regional Sales Manager for North and South Carolina. This position would require Erdle to travel through these territories to promote and sale ISCO's specialized products and services.

Specifically, in regards to the Non-Compete Agreement, O'Neill testified that the main purpose of such a contract was to protect the legitimate business interest of ISCO as it was involved in such a highly-specialized and competitive market. Furthermore, in regards to the duration of the Non-Compete Agreement, O'Neill explained that three (3) year duration is necessary because it would typically take ISCO that amount of time to train a new employee to acquire sufficient specialized knowledge to sell its products and develop business relationships with prospective customers. O'Neill further explained that the Non-Compete Agreement needed to restrict both

existing and prospective customers because the nature of selling its products usually required approval from a chain of prospective buyers. In support of this claim, O'Neill provided an example of ISCO selling its products to a municipality, which often requires not only the approval of the contractor, but also the approval of the engineer and/or agent of the municipality. Therefore, although a sales representative from ISCO may mostly be interacting with the contractor in selling products and services, the Non-Compete Agreement needed to include restriction on the prospective buyers such as the engineer and/or agent.

Here, in examining the language of the Non-Compete Agreement, along with O'Neill's detailed testimony explaining the same, the court finds that the non-compete restrictions in the agreement are unreasonable as it is too broad in scope and overly burdensome to Erdle. As Erdle highlighted during cross examination of O'Neill, it appears that these covenants would prohibit Erdle from attempting to sell *any product or services* to any existing or prospective customers regardless of whether the product or services being sold are in competition with ISCO. Furthermore, the Non-Compete Agreement would also restrict Erdle from accepting "any payment from a third party doing business with [ISCO] (including without limitation a commission) without turning over the payment to the Company or its designee[.]" *See* [DE-5], Ex. 2, p. 3.[2] These restrictive covenants, taken together, create an agreement that is excessively broad in nature and therefore the court finds ISCO will not likely succeed on the merits of this case.[3] Because ISCO cannot demonstrate that it is likely

---

[2] During cross examination of O'Neill, Erdle asked whether working at entities such as Blue Bell Creamery, UPS, AT&T, and Blue Bonnet Café would violate the terms of the Non-Compete Agreement. O'Neill acknowledged that these businesses did not compete with ISCO, but would be classified as third party entities that Erdle would be precluded from receiving any form of payment.

[3] The court provided both parties an opportunity during the hearing to reach an agreement on some form of amendable preliminary injunctive relief. However, the parties were unable to reach such an agreement. As the court, at the preliminary injunction stage, was not actually determining the validity of the Non-Compete Agreement, but

11

to succeed on the merits, its motion fails to meet the four-prong standard as required by *Winter*. Accordingly, ISCO's Motion for Preliminary Injunction [DE-16] is DENIED.

## IV. CONCLUSION

Based on the aforementioned rationale, ISCO's Motion for Preliminary Injunction [DE-16] is **DENIED**. The Clerk of Court is DIRECTED to continue management of this case.

SO ORDERED.

This the 28th day of December, 2011.

*[signature]*
JAMES C. FOX
Senior United States District Judge

---

only ISCO's likelihood of success on the merits, the court chose not to exercise the option of blue penciling the agreement. *See Technology Partners, Inc. v. Hart*, 298 Fed. Appx. 238, 244, n.4 (4th Cir. 2008) (unpublished opinion) (holding that since the court was not actually determining the validity of the covenants on the merits, the employment of blue penciling to try to ensure their validity would not have been appropriate on a motion for preliminary injunction).